# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MEREDITH G. HAMPTON and  :
GEORGE STRAKOSCH,    :
   Plaintiffs,      :
              :
v.           :   Case No. 3:04cv346 (PCD)
              :
DIAGEO NORTH AMERICA, INC.  :
and MARK WALLER,     :
   Defendants.     :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs bring this action alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60, et seq., and breach of contract. Defendants Diageo North America, Inc. ("Diageo"or the "Company") and Mark Waller move for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that none of Plaintiffs' claims give rise to a triable issue of material fact and that the claims are unsustainable as a matter of law. For the reasons stated herein, Defendants' Motions for Summary Judgment as to Plaintiffs Meredith Hampton [Doc. No. 78] and George Strakosch [Doc No. 81] are **granted** in part and **denied** in part.

## I.  BACKGROUND

Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Plaintiffs as the non-moving parties. See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003).

### A.  Background on Defendants

Diageo, a manufacturer, marketer, and distributor of alcoholic beverages, was formed in

December 1997 with the merger of Guinness and Grand Metropolitan. Until April 2001, Diageo conducted its national brand marketing from its offices in Stamford, Connecticut. This practice was referred to as "Regional Brand Strategy," but in fact the nationwide strategies for marketing each beverage were developed in Stamford and implemented by regional field offices, with local variations as appropriate.

In April 2001, Diageo discontinued this practice and replaced it with five regional In-Market Companies ("IMCs"). Each IMC was assigned lead responsibility for developing and implementing national brand marketing strategies for the products with the strongest market in that region. For example, there is reportedly a large market for Cuervo tequila in the Western states, so responsibility for developing national brand marketing strategy for Cuervo was assigned to the West IMC.

In June 2002, Diageo underwent another significant reorganization of its marketing functions, with a return to centralized development of national marketing strategy through the Consumer Strategy and Marketing group ("CSM"), again located in Stamford, Connecticut. During the summer of 2002, Defendant Mark Waller became the new senior executive of marketing and head of CSM, with the title Executive Vice President for Consumer Strategy and Marketing for Diageo North America. Before assuming this position, Waller had served as the head of the Central IMC in Chicago.

In conjunction with the marketing restructuring, Diageo had positions available for a number of Director-level (Level 4) jobs, including Director of Popular Brands, Director of High Energy, Director of Cuervo, Director of Category Management Brands, and Director of Captain Morgan Rums. The Director of High Energy position was initially posted as two separate

positions that were later combined, and the Director of Captain Morgan Rums position was not posted because it became available only after a "lean-in" candidate declined the position.[1] Director-level employees such as Plaintiffs who were not selected for these or other available positions risked being left without jobs at Diageo because their current positions would be eliminated following the restructuring. The Company made general assurances in its online "Resourcing Process" web-page regarding the fairness of the application and hiring process, and stated that all positions would be posted. As discussed in more detail below, Plaintiffs each applied for some of these jobs and had interviews, led by Waller, for those positions on June 26 and 27, 2002, and did not receive job offers for those positions.

**B.** **Background on Plaintiff Meredith G. Hampton**

Meredith G. Hampton was born on January 13, 1956. She was hired by Diageo's predecessor company Heublein in 1984, at age 28. She was promoted in 1998 at age 42 from Brand Manager, a Level 5 position, to "Brand Strategy Director, Jose Cuervo Tequilas and Margarita Mix," a Level 4 position.[2] After the Cuervo Regional Brand Strategy Team she had worked on in Stamford was disbanded and the West IMC took over Cuervo marketing in 2001, Hampton was named at age 45 to be "Director of Marketing, Integration," which was also a Level 4 position. Throughout her career, Ms. Hampton received generally positive and in some respects quite strong job evaluations, which portray her as a hard worker who was very committed to the Company.

---

[1] A "lean-in" candidate was someone already performing a comparable function who was offered the position first.

[2] A lower number indicates a higher level position; therefore, a Level 4 job entails more authority than a Level 5 job.

After the plan to recentralize marketing in the CSM was announced in June 2002, Hampton applied for the positions of Director of Popular Brands and Director of High Energy. Plaintiffs state that they were instructed by the Company to apply for those jobs which they most wanted, rather than apply for all available positions. She was interviewed on June 26 or 27, 2002 by Waller and Alan Weber, Vice President of Marketing Integration. Defendants claim that Waller informed Hampton at the beginning of the interview that she would also be considered for the Director of Captain Morgan Rums position which had become available on short notice (Waller Dep. at 66), while Hampton claims that she was not told this during the interview and was only informed after the fact that she had been considered, and that she does not believe that she was in fact considered for that position. (Pl.'s R. 9(c)(2) Statement of Disputed Facts, P 16; Hampton Dep. at 235-236). Hampton describes the interview as "odd," with Waller's questions focusing on her former supervisor Ted Hissey's management style, which Defendants suggest was intended to probe Hampton's viewpoints and style regarding confrontation but which Hampton felt unduly limited her opportunity to discuss her experience and qualifications for the positions. (Hampton Dep. at 226-230). However, there is no indication that anything regarding age was said during the interview.

Hampton was informed by Waller on July 8, 2002 that she had not been selected for any of the three positions for which she applied or may have been considered. Hampton was 46 at the time. Director of Popular Brands was filled by Pamela Whiteside, age 38; Director of High Energy was filled by Jennifer Van Ness, age 34; and Director of Captain Morgan Rums was filled by Jennifer Young, age 29. Alan Weber, who had interviewed Hampton along with Waller, allegedly told Hampton on the day she found out that she did not get a position that

"[T]he two of us are in the same boat. You may have the same problem as I do. You are not a young 35 year old." (Hampton Dep. at 331.) Defendant Waller allegedly told Hampton that she could apply for other positions but that all jobs would come back through him, which she took to mean that she shouldn't bother applying because he would prevent her selection. (Hampton Dep. at 239.) Nonetheless, she applied on October 23, 2002 for the Level 4 position of "Director of Innovation," a position under Waller in the CSM, for which she was not interviewed (Def.'s R. 56(a)(1) Statement, ¶ 23), and which was subsequently filled by Jennifer Young, age 29. This was the same Jennifer Young who had been named Director of Rums four months earlier.

In November 2002, Hampton accepted a temporary position within Diageo working on the transition of the Bass beer distributorship to another company. From November 2002 until late February 2003, Hampton was relocated to the seventh floor, away from the others on the CMS team. She states that the move of her office occurred before she was assigned to the Bass job. Beginning in November 2002, she was periodically not invited to CMS lunches and meetings and felt that she was not given adequate supervision for purposes of professional development and performance management. (Hampton Dep. at 296.) In November 2002, Waller allegedly said to Hampton upon seeing her in the hallway that she was "like a bad penny," which Hampton took to mean that he was annoyed that he couldn't get rid of her because she just kept coming back. (Hampton Dep. at 247.) On December 4, 2002, Hampton made a report of age discrimination to Waller and Diageo Human Resources and filed an age discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

Hampton claims she had understood the Bass job to be a lateral transfer, meaning that she would stay at Level 4 (Director), but that she subsequently discovered that she had been demoted

to Level 5 (Manager). Diageo contests that the Bass job constituted a demotion, highlighting the undisputed fact that Hampton's salary did not change. In response, Hampton points to Diageo's Consumer Strategy and Marketing Organization Structure chart, dated December 12, 2002, which shows her listed as "Brand Manager: Bass." As further evidence that she was no longer a Level 4 Director, Hampton states that she was denied participation in December 2002 in the Share Option Plan, when the other Level 4 marketing directors received their options, thus constituting a change in her compensation. Diageo contends that she was denied the options because it was known that her future tenure with the company was limited, given that she had not received a permanent offer of employment and given that her current Bass position was transitional and temporary. On January 10, 2003, an email from Director of Lagers Damian Kernahan referred to Hampton as a "Brand Manager," which she contends was how she first learned of her demotion to Manager. She claims this caused her humiliation, noting that one colleague even called to inquire what had happened to bring about the demotion.

On April 10, 2003, Diageo responded to Hampton's CHRO complaint. Upon conclusion of her work on the Bass project, Hampton was terminated on June 30, 2003 at age 47. Hampton filed the Complaint in this case on March 1, 2004.

## C.    Background on Plaintiff George Strakosch

George Strakosch was born on June 16, 1954. He was hired in October 1997 as a consultant and became a full time employee of Diageo in July 1998, at age 44, assuming the title of North American Strategy Manager for Jose Cuervo Super Premium Tequilas. In 2000, Strakosch settled a previous age discrimination claim against a former employer, Nielsen Marketing Research. (Strakosch Dep. at 156-157, 160.) In late 2000, Strakosch was made

"Marketing Manager: Integration," a Level 5 job.  In 2001, at age 47, he was promoted to "Marketing Director: Integration," a Level 4 job.  Strakosch states that he attended a business dinner on October 10, 2001 at which Rob Malcolm, the head of Diageo Global Marketing, said, "You want young stallions to run your business, with a few wise old owls."

After the plan to recentralize marketing in the CSM was announced in 2002, Strakosch applied for the positions of Director of Cuervo and Director of Popular Brands. He was interviewed on June 26 or 27, 2002 by Waller and Alan Weber.  Strakosch states that, contrary to the assertions of Defendants, he was not told during the interview that he would be considered for the unposted Director of Captain Morgan Rums position which had become available when the lean-in candidate had withdrawn at the last minute.  Strakosch states that he, like Hampton, was asked questions regarding Ted Hissey's management style, which could not have been asked of other applicants because they had not worked for Hissey.  Strakosch does not report any reference to age during the interview.

Strakosch, then age 48, was not selected for any of the three positions.  Director of Cuervo was filled by Carl Swedberg, age 36; Director of Popular Brands was filled by Pamela Whiteside, age 38; and Director of Captain Morgan Rums was filled by Jennifer Young, age 29. Like Hampton, Strakosch has a history of generally positive performance reviews.  However, with respect to the Director of Cuervo position, Defendants state that their contractual relationship with Jose Cuervo International ("JCI") gives JCI decision-making authority about who works on that brand, and that JCI had told Diageo that it would not approve Strakosch for the Director of Cuervo position based on their previous working experience with him.  (Waller Dep. at 63-64, 126-127.)

In July 2002, Strakosch was approached by Mark Waller to inquire whether Strakosch would be interested in the "Director of Trends and Best Practices" position. The Director of Trends and Best Practices job was a Level 4 position, placing it on par with those for which Strakosch had applied, but he declined it on the basis of his belief that it would be "career suicide" to accept the job, given that he wanted to continue to build his career in the brand marketing field. Strakosch also states that he was interested in a Brand Innovation Group position for which he never applied because it was never posted, contrary to the stated policy. On October 8, 2002, Waller discussed the temporary Bass job with Strakosch, who was subsequently assigned to the position, along with Hampton. As with Hampton, Strakosch's salary did not change, but he was denied participation in December 2002 in the Share Option Plan, and was moved with Hampton to a different floor. Also as with Hampton, it is not clear whether Strakosch knew that the Bass job was a manager position rather than a Level 4 director position like his previous role, although they do appear to have understood that the position was not permanent and would end when the project was complete.

On December 4, 2002, Strakosch made an age discrimination report to Waller and to Diageo Human Resources and filed his complaint with the CHRO. On March 26, 2003, Diageo responded to Strakosch's CHRO complaint. Strakosch applied for the position of Director of Crown Royal in July 2003, and was interviewed by James Thompson, Vice President of Marketing, a position under Waller in the CSM. (Ex. EE.) Strakosch was not offered the position, and Jerry Knight, age 34, was selected as Director of Crown Royal. Strakosch was terminated on August 25, 2003, at age 49, and he filed this Complaint on March 1, 2004.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

## III.    DISCUSSION

### A.    Age Discrimination

Defendants move for summary judgment on Plaintiffs' claims, brought pursuant to the

ADEA and CFEPA, that Diageo's failure to select Plaintiffs for newly created lateral positions during the restructuring of the marketing department during the summer of 2002, or for other positions for which they later applied, and their subsequent termination in the summer of 2003 upon expiration of their previous positions and the transitional positions to which they had been assigned, constituted discrimination on the basis of age.

Plaintiffs' age discrimination claims are analyzed under the three-step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519, 524 (1993). See, e.g., James v. N.Y. Racing Ass'n, 233 F.3d 149, 153 (2000) (applying McDonnell Douglas to ADEA claims). A plaintiff has the initial burden of establishing a prima facie case of discrimination by showing that, "(I) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination[.]" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2006). A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination, id., and the burden of production shifts to the defendant. If the defendant then proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001), "the presumption of discrimination drops out," Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001), and the plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons but were a pretext for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)). At all times, the ultimate

burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated against the plaintiff.  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 256).

To make out a prima facie case of employment discrimination under the ADEA, Plaintiffs must show that (1) they are members of a protected class; (2) they are qualified for the jobs; (3) they suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Reeves, 530 U.S. at 142; Fisher v. Vassar Coll., 114 F.3d 1332, 1335 (2d Cir.) (en banc), cert. denied, 522 U.S. 1075 (1998); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997); Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997).  Plaintiffs' burden at this stage is not an onerous one; they merely have to present facts sufficient to give rise to a presumption of discrimination.  See Burdine, 450 U.S. at 254; Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456,  467 (2d Cir. 2001) ("A plaintiff's burden of establishing a prima facie case is de minimis.").

Plaintiffs have established that they were at all relevant times over age 40 and therefore are members of the protected class.  Plaintiffs' long tenure in marketing positions with the Company (18 years for Hampton and 4 years for Strakosch in 2002), with 4 years and one year, respectively, at the same level (Level 4) as the jobs for which they were applying, combined with their positive performance evaluations and the fact that they were selected for interviews in all but one instance, establishes that the plaintiffs had at least the minimum qualifications for the positions for which they applied.  Plaintiffs suffered an adverse employment action when they were not hired for lateral positions for which they applied, given that their current jobs would be terminated when the reconfiguration of Diageo's marketing function was complete.  Plaintiffs also suffered adverse employment actions when they were arguably demoted to lower level

positions and then terminated from the Company.

The following evidence raises an inference of age discrimination. All the candidates selected for the six positions for which Plaintiffs applied or were considered in June 2002 and afterward were significantly younger, at 29 to 38 years of age, than Plaintiffs, who were ages 46 and 48 at the time. Specifically, they were Jennifer Van Ness, age 34, who was selected for Director of High Energy; Jennifer Young, age 29, who was selected for Director of Captain Morgan Rums; Pamela Whiteside, age 38, who was selected for Director of Popular Brands; and Carl Swedberg, age 36, who was selected for Director of Cuervo. In addition, Craig Joden, age 37, was selected for Director of Category Management Brands, the other Level 4 marketing position available in June 2002, although neither Plaintiff applied for this position. Subsequently, in October 2002, Jennifer Young, age 29, was hired for Director of Innovation, for which Plaintiff Hampton applied. Finally, in July 2003, Jerry Knight, age 34, was hired for Director of Crown Royal, for which Plaintiff Strakosch applied. Plaintiffs have successfully made a prima facie showing of employment discrimination on the basis of age.

Defendants offer several reasons that they selected the other candidates rather than Plaintiffs, which, if credited, constitute legitimate, non-discriminatory reasons. Defendants assert that the selected candidates had more of the desired skills and experience than Plaintiffs. While the specifics vary by position, the justifications include that the selected individuals had more experience with marketing the relevant brand or category of alcohol; that they had more experience or success with the development and marketing of new products; that they had greater familiarity with the geographic region in which each product is most popular, particularly through work in an in-market company in that region; and that they were stronger in particular

skill sets, such as strategic thinking.

Under the McDonnell Douglas burden-shifting framework, Plaintiffs must proffer evidence to show that Defendants' apparently legitimate non-discriminatory reasons are actually a pretext for discrimination. Defendants' assertions that the candidates they selected were better qualified than Plaintiffs are undermined by the fact that, in two instances, the candidate hired did not have the minimum qualifications stated in the job description, whereas Plaintiff(s) did. [Doc. No. 86 at 28-29.] The Director of High Energy job description called for eight years of Fast Moving Consumer Goods experience, with two years at an advanced manager level. [Doc. No. 84, Ex. 16.] Jennifer Van Ness, who was selected for that position in 2002, had only six years of such experience, having received her MBA in 1995 [Doc. No. 90, Ex. Van Ness], while Plaintiff Hampton had as much as eighteen years of experience in this area. [Doc. No. 90, Ex. Hampton Affidavit, ¶ 5.] The Director of Popular Brands job description required an MBA or senior brand management experience [Doc. No. 84, Ex. 16.]. Pamela Whiteside, who was selected for the position, lacked an MBA, although she did have a Master of Marketing Research. [Doc. No. 90, Ex. Whiteside]. Ms. Whiteside had only one year of brand marketing experience, as she had been primarily a market researcher. Id. By contrast, Hampton had an MBA from Columbia and 21 years of brand marketing experience, and Strakosch had an MBA from the University of Virginia and 13 years of brand management experience. [Doc. No. 86 at 29.] Given that the candidates selected did not comport with the Company's own description of the job requirements, this procedural irregularity supports an inference that the qualification-based reason given for the selection was pretextual.

Since Plaintiffs were ten to twenty years older than the candidates selected, Plaintiffs

generally had more years of marketing experience at Diageo and with other companies than did the people hired. However, the parties debate extensively the particular relevance to the posted jobs of the various types of experience possessed by each selected candidate as compared with that of Plaintiffs.

Plaintiffs question the credibility of Defendants' emphasis on candidates having had experience in the regions where the brands of alcohol for which they would be responsible are most popular. Both sides raise numerous factual issues about which brands or categories of alcohol sell best or are most popular in which regions, suggesting that any differences in this respect may be negligible, both in magnitude and in importance. More significantly, Plaintiffs question why regional experience should be an important factor, especially since it would have been obtained primarily through the regional IMCs, a company structure which lasted only about a year, therefore limiting the duration and presumably the value of any regional experience gained through it. Plaintiffs question why, in returning to a national brand marketing strategy after a brief experiment with the regional strategy, Diageo would emphasize regional experience in the IMCs, such as that had by many of the selected individuals, rather than experience in national marketing, which was the nature of Plaintiffs' positions with the Company before the shift was made to IMCs.

Where, as here, Plaintiffs raise legitimate questions about whether the proffered reasons are credible or convincing, that goes toward establishing that the reason is pretextual. Meiri v. Dacon, 759 F.2d 989, 997 n. 13 (2d Cir. 1985) (reasonableness of employer's justification for employment action is probative on question of pretext). Plaintiffs also contend that Defendants' explanations for the reasons certain candidates were selected have shifted over time.

That decision makers in the hiring process and some people who continued in their jobs essentially unchanged (called "lean-ins") were over 40 years old does not preclude age discrimination against Plaintiffs, as it is possible to discriminate against members of one's own protected class.  See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1998), quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").  Indeed, the alleged statement by Rob Malcolm, the head of Diageo Global Marketing, that "You want young stallions to run your business, with a few wise old owls" could be taken to evince an institutional preference for an age disparity between upper level management and the remainder of employees.

Plaintiffs have also testified about other comments arguably suggesting that the rationale offered by Defendants for their selection of other candidates over Plaintiffs is in fact a pretext for age discrimination, particularly the alleged statement to Hampton after the interviews by Alan Weber, who had conducted the interviews along with Waller, that "[T]he two of us are in the same boat.  You may have the same problem as I do.  You are not a young 35 year old."  In support of their contention that Diageo has a "culture of age discrimination," Plaintiffs point to several other comments and actions, such as distribution of lists that contained interviewees' dates of birth, by persons in leadership roles within the company that appear to place an emphasis on age and to prefer younger workers.  [Doc. No. 87 at 10-14.]  Defendants raise various questions about whether these comments were in fact made, whether they were made by or known to persons with decision-making authority with respect to Plaintiffs' jobs, and what

meaning and weight should be ascribed to the comments. It is appropriate for a jury as factfinder to make determinations regarding the weight, credibility, and meaning of such comments.

Six people, all significantly younger than Plaintiffs, were selected for the available positions for which Plaintiffs applied, notwithstanding the fact that Plaintiffs had good records with the Company and were apparently qualified for the positions, and arguably more qualified than at least some of the applicants that were selected. The Court does not sit as a "super-personnel department" Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 106 (2d Cir. 2001), and Defendants offer reasons why each applicant was selected and why that person's experience was most suitable for the position. However, the alleged comments suggestive of age discrimination, the inconsistencies between the job descriptions and the qualifications of certain of the selected applicants, and the fact that some of the reasons given for selecting applicants are of questionable credibility and logic mean that Plaintiffs have demonstrated that the reasons articulated by Defendants for the selections may be a pretext for age discrimination. The evidence is strong enough to support an inference that Plaintiffs may not have been afforded the same consideration in the hiring/retention process as younger candidates. Therefore, a genuine issue of material fact exists as to whether Plaintiffs' age was a motivating factor in Defendants' failure to select them for the positions for which they applied or were considered, and in their resulting termination, and the Court is precluded from granting summary judgment to Defendants on Plaintiffs' age discrimination claims.

**B.      Retaliation**

Plaintiffs' claims of retaliation are also analyzed under the three-part burden shifting analysis set forth in McDonnell Douglas, 411 U.S. 792. To make a prima facie case of

retaliation, Plaintiffs must show by a preponderance of the evidence (1) that they participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. Slattery, 248 F.3d at 94. A plaintiff's burden at this stage is de minimus. Id. Once Plaintiff has established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action. Id. at 94-95. If Defendants are able to make this showing, then the burden shifts back to Plaintiff to prove that the proffered reason is merely a pretext for unlawful discrimination. Id. at 95.

The Plaintiffs engaged in protected activity when they filed an age discrimination claim with the CHRO on December 4, 2002. They notified Mark Waller and Diageo's Human Resources department. Waller, Suki Balet from Diageo Human Resources, and James Thompson subsequently attended a meeting to discuss the age discrimination claims. Therefore, Defendants were aware of Plaintiffs' participation in a protected activity.

The Second Circuit defines an "adverse employment action" as one in which a plaintiff endures a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted); see Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004). For a change in working conditions to be "materially adverse," it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. Employment actions that have been deemed sufficiently adverse include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (ellipsis in original)

(citations omitted).

Plaintiffs suffered adverse employment actions in that both were demoted from Level 4 (Director) to Level 5 (Manager), with the attendant loss of status and loss of opportunity to receive stock options, although their salaries were not decreased. In addition, Strakosch applied for the position of Director of Crown Royal in July 2003, and was interviewed but not selected. Finally, both Hampton and Strakosch were terminated during the summer of 2003.

Plaintiffs also allege a number of other retaliatory actions, including exclusion from meetings, the relocation of Plaintiff's offices, and inadequate supervision, among other complaints, some of which started before December 4, 2002, and none of which in themselves constitute an adverse employment actions. For an employment action to be sufficiently adverse, "there must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions or privileges of employment." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). Thus, courts have held that the relocation of a plaintiff's desk to another location, for example, does not constitute an adverse employment action. See Sioson v. Knights of Columbus, 160 F. Supp. 2d 316, 322 (D. Conn. 2001).

In order to establish a prima facie case, Plaintiffs must also show a causal connection between the protected activity and the adverse employment actions. In order for adverse employment action to be retaliatory, it must occur after the protected activity took place. Here, Plaintiffs filed their CHRO claim on December 4, 2002, which was after they began work on the Bass job in November 2002, undermining their claim that the Bass assignment constituted retaliatory demotion. It is possible that retaliation could begin upon the employer's discovery of the employee's intent to file a claim or engage in other protected activity, but before the actual

filing took place, but that has not been alleged here.

The issue of whether the Bass job could constitute retaliatory demotion is complicated by Plaintiffs' claim that they understood when they accepted the Bass position in November 2002 that it was a lateral move to another Level 4 position. They claim that they only subsequently discovered, through their failure to receive stock options at year end as Directors usually do, and through a mass email sent out by the Director of Lagers on January 10, 2003, that their new title was "Manager." Plaintiffs' contention that they initially understood the Bass job to be a lateral move is bolstered by the fact that their salaries did not change, and therefore they had no immediate notice in November 2002 of any change in rank. It is also supported by the fact, highlighted by Defendants, that "no one told [Plaintiffs that their] title or job level had officially been changed." [Doc. No. 82, at 34.] Defendants deny that Plaintiffs were demoted. Id. at 33-34. However, Plaintiffs have submitted Diageo's organizational charts dated December 2002 that show Plaintiffs labeled as "Manager."

Notwithstanding that there is ample evidence upon which a reasonable jury could conclude that Plaintiffs were indeed demoted, Plaintiffs do not allege that the Bass jobs they accepted in November 2002 were Level 4 jobs that were only subsequently reconstituted as Level 5 jobs in retaliation for their December 2002 CHRO filing. While Plaintiffs clearly contend that they did not *know* in November 2002 that the Bass jobs were demotions [Doc. No. 87, at 43], Plaintiffs don't seem to dispute that, in reality, the jobs were indeed demotions from their inception in November 2002, and they offer no evidence to the contrary. Id. Therefore, while the demotions themselves and the less than forthright manner in which they were conducted may be relevant to the underlying claim of age discrimination, the November demotions cannot

reasonably be attributed to retaliation for the December CHRO claim.

Similarly, the Bass jobs were characterized from the start as involving transitioning the product to a new distributor, and Plaintiffs knew when they accepted the Bass jobs in November 2002 that these were temporary positions that would not provide them with permanent employment with Diageo. [Doc. No. 87, at 43.] While they may have hoped to obtain other employment within the company in the interim, the termination of their employment upon completion of the Bass project the following summer was a contingency they had agreed to in accepting the Bass jobs in November, and therefore the terminations cannot reasonably be attributed to retaliation for the December CHRO claim. Even if Hampton and Strakosch had been in permanent positions at the time of filing their CHRO complaint in early December, it is questionable whether their terminations seven and nine months later, respectively, would be sufficiently close in time to the CHRO complaint to demonstrate causation, given that temporal proximity of the adverse action to the protected activity is a key indicator of retaliation. See Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at *31-32 (D. Conn. 2006); Clark City School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

Plaintiffs' failure to be selected, subsequent to their filing of the CHRO claims, for other Diageo positions for which they applied and were qualified, could potentially establish the causal connection between the protected activity and the adverse employment action that is required to establish a prima facie case of retaliation. However, during her approximately seven months of employment with Diageo following the filing of her CHRO claim, Plaintiff Hampton did not apply for any positions within the Company. She asserts that she did not apply because Mark Waller had told her she could apply but that all decisions would come through him, which she

understood to mean that he would make sure she was not selected. Still, absent an application, there is no adverse employment action, and it is not reasonable to hold the Company accountable for Plaintiff's anticipation or speculation that she would be retaliated against if she were to apply, at least without more evidence than the single comment, which could be interpreted more than one way, to support her assessment.

In the approximately nine months he was employed by Diageo after filing his CHRO claim, Plaintiff Strakosch applied for only one job, the Director of Crown Royal position, for which he was interviewed and not selected. Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment," "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). Strakosch offers no direct evidence that his failure to get the Crown Royal job was attributable to retaliatory animus, nor evidence of disparate treatment of similarly situated employees. While causation can be established for the sake of a prima facie case by temporal proximity alone, the gap between Strakosch's December 4, 2002 complaint and his failure to get the Crown Royal job in July 2003 makes the relationship between the two events rather remote.

Viewing all factual ambiguities in Plaintiffs' favor, the Court finds that there is insufficient evidence of any causal connection between the filing of the CHRO complaint and the subsequent adverse employment actions.

## C.    Aiding and Abetting

Plaintiffs also brought an action for Aiding and Abetting Age Discrimination and

Retaliation in Violation of Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen.

Stat. 46a-60(a)(5), as to Defendant Mark Waller, contending that Waller aided and abetted his

employer and co-defendant Diageo North America in its age discrimination. (Compl. ¶ 45.)

[Doc. No. 1.]  The aiding and abetting claim was not among those that Defendants moved to

dismiss.  [Doc. No. 19.]  Although Defendants move for summary judgment on "all counts" of

Plaintiffs' Complaint [Doc. Nos. 78 & 81], Defendants' only argument with respect to the aiding

and abetting claim appears in two sentences in a footnote, where they state that "[t]he aiding and

abetting claim against Waller fails as a matter of law because Plaintiff does not allege

discriminatory conduct by any person other than Waller himself." [Doc. Nos. 79 & 82 at n. 10,

citing Bolick v. Alea Group Holdings, Ltd., 278 F. Supp. 2d 278, 282 (D. Conn. 2003).]

        Bolick held that a sole perpetrator cannot be held liable under the CFEPA for aiding and

abetting, since by definition a person cannot aid and abet himself.  Id. at 282-83.  However, "an

individual may aid and abet his employer's discrimination." Id. at 283, n.5, citing Jones v. Gem

Chevrolet, 166 F. Supp. 2d 647, 650 (D. Conn. 2001).  Furthermore, "[t]his individual liability is

particularly applicable to supervisors in the use of their authority, even where the employer's

liability is derived from the supervisor's wrongful conduct." Id., citing Wasik v. Stevens

Lincoln-Mercury, Inc., 2000 U.S. Dist. LEXIS 15438, No. 3:98CV1083, 2000 WL 306048, at *6

(D. Conn. Mar. 20, 2000).  That is the scenario here.

        In deciding that the supervisor in Bolick was a sole perpetrator who was not aiding and

abetting his employer, the court considered the fact that the company in that case had taken

action against the supervisor with respect to the behavior at issue.  Bolick, 278 F. Supp. 2d at

282.  No such evidence of attempts by Diageo to take action against Waller for age

discrimination exist in this case. To the contrary, Plaintiffs have adduced evidence, discussed above, which could be construed as reflecting a culture of age discrimination within the Company, and in that context, Waller's actions can be seen as motivated by and responsive to cues regarding Company values, as transmitted from higher up within it. This paints Waller not as a sole perpetrator or rogue discriminator, in which case Diageo would be potentially liable for his actions only under the doctrine of respondeat superior, pursuant to Conn. Gen. Stat. § 46a-60(a)(1), and Waller could not be said to have aided and abetted himself. While Waller's actions are certainly the primary source for the Company's liability, Plaintiffs have also offered evidence that Waller's discrimination was sanctioned or invited by the Company's values. A factfinder could conclude that Waller's actions assisted Diageo in implementing an organizational preference for younger workers, and in that sense he aided and abetted age discrimination by the Company.

Alternatively, as <u>Bolick</u> noted, a perpetrator can also be subject to liability for aiding and abetting if acting in concert with others. <u>Bolick</u>, 278 F. Supp. 2d at 282, citing <u>Tomka v. Seiler Corp.</u>, 66 F. 3d 1295, 1300-03 (2d Cir. 1995) (abrogated on other grounds by <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)) and <u>Perks v. Town of Huntington</u>, 96 F. Supp. 2d 222, 228 n.2 (E.D.N.Y. 2000) (interpreting the substantially similar New York correlate to CFEPA). To the extent that Waller was not the sole decision maker with respect to the non-selection of Plaintiffs for the jobs for which they applied, and for their subsequent demotions, he was acting in concert with others who had a say in those decisions. By its language, the aiding and abetting provision of the CFEPA "appears to contemplate liability towards a party who in some way helps or compels another to act in a discriminatory manner."

Bolick, 278 F. Supp. 2d at 282, quoting Wasik, 2000 U.S. Dist. LEXIS 15438, 2000 WL 306048, at *7.  A reasonable factfinder could conclude that Waller exercised his authority to compel or influence others to behave in ways that supported his and Diageo's alleged age bias against Plaintiffs.

Given that summary judgment has been granted with respect to the retaliation claim, Waller cannot be held liable for aiding and abetting retaliation which has been found not to have occurred, so summary judgment is **granted** as to Waller's aiding and abetting retaliation, but summary judgment is **denied** as to Waller's aiding and abetting age discrimination.

**D.    Breach of Contract**

The breach of contract claim was limited in the Ruling on Defendants' Motion to Dismiss to the Resourcing Process, a series of web pages which provided information about the online application process and the selection process.  A review of the Resourcing Process documents and consideration of the context in which they were presented reveals that they do not constitute a contract, express or implied, and therefore any deviation from them cannot constitute breach of contract.

Plaintiffs both signed contracts agreeing to at-will employment when they were hired. Hampton's employment contract additionally stated that "This agreement may be amended only in writing signed by the president of UDV NA on behalf of the company," and Strakosch's stated that "You understand that no manager or representative of UDV and/or its subsidiaries, other than the chairman or president of UDV Americas, has any authority to enter into any agreement for employment for any specific period of time, or to make any agreement contrary to the foregoing."  Plaintiffs testified that they were at-will employees and that they had not received

communications from the company president that indicated to them a change in that status.

Plaintiffs argue that Diageo President Paul Clinton's May 10, 2002 email, which announced the Resourcing Process and referred employees to an attached letter from Senior Human Resources Vice President Linda Sorrell for details, was intended to influence employees not to seek employment with other companies because of the statement in her letter that "My goal is to make sure that our resourcing process is clear, transparent, and - above all - fair." The letter then referred employees to the website which contained information about the procedures that would be used in the resourcing process through which employees would be selected for positions in the restructured marketing department. Neither the letter nor the resourcing process website itself contained a disclaimer of the intent to contract or to modify the terms of employees' existing employment contracts. Plaintiffs maintain that Sorrell's statement regarding the goal to proceed fairly, combined with President Clinton's implicit endorsement of that statement through his email distribution of her letter, signified an intent to contract, and that Defendants' subsequent alleged deviations from certain of the procedures posted on the website, most notably the failure to post certain positions, constituted breach of contract.

Plaintiffs' argument is not persuasive. It seems doubtful that Clinton's circulation of Sorrell's letter constitutes an endorsement of the contents thereof that is significant enough to satisfy the express requirement in Plaintiffs' employment contracts that only the Company President or Chairman can modify employees' at-will employment status. Assuming, however, that the contents of the letter can be attributed to Clinton for this purpose, the statement regarding the goal of fairness is merely aspirational, and in any case fairness is so subjective that the announcement of the intent to pursue such, without more, can hardly be the basis for forming a

contract modifying an at-will employment agreement. The Resourcing Process webpage is informational, and neither its content nor format can be reasonably construed as contractual. Furthermore, the Resourcing Process as described on the webpage clearly contemplates that some people will not receive offers for positions. Under "Selection Process," it reads, "If you are not selected for a position..." and goes on to discuss severance policies.

Because breach of contract requires both the existence of a contract and a violation of the terms of that contract, and because no reasonable factfinder could conclude that a contract had been formed, summary judgment is **granted** as to the breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment [Doc. Nos. 78 and 81] are **granted** in part and **denied** in part. Defendants are awarded summary judgment on Plaintiffs' claims of retaliation, aiding and abetting retaliation, and breach of contract. Summary judgment is denied with respect to Plaintiffs' claims of age discrimination and aiding and abetting age discrimination.

SO ORDERED.

Dated at New Haven, Connecticut, January  31 , 2008.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court